UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT McLEOD,

     Plaintiff,                   Case No. 1:20-cv-13181

                                   District Thomas L. Ludington

v.                            Magistrate Judge Kimberly G. Altman

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.     Introduction

This is a Social Security case.  Plaintiff Robert James McLeod ("McLeod") brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").  Both parties have filed summary judgment motions (ECF Nos. 21, 24), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 24) be GRANTED,

that McLeod's Motion for Summary Judgment (ECF No. 21) be DENIED, and that the Commissioner's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

McLeod was 38 years old at the time of the July 15, 2005 alleged onset date.  (ECF No. 13, PageID.170).  He graduated from high school and worked previously as a bartender, satellite installer, network control technician, and retail specialist (ECF No. 13-6, PageID.191-192).  He alleges disability due to brain injuries, spinal injuries, Post Traumatic Stress Disorder ("PTSD"), depression, Chronic Pain Syndrome ("CPS"), back injuries, migraine headaches, balance problems, and depression.  (*Id*., PageID.190).

After McLeod's January 2, 2018 application was denied at the initial level on May 24, 2018, McLeod requested an administrative hearing, held on January 27, 2020 before Administrative Law Judge ("ALJ") David A. Mason, Jr.  (*Id.*, PageID.71, 121).  McLeod, represented by attorney Sarah Schairbaum, testified, as did a Vocational Expert ("VE").  (*Id.*, PageID.75, 102).[1]

McLeod offered the following testimony at the hearing:

---

[1] Although the hearing transcript shows that McLeod's counsel amended the alleged onset date to "July 2009," the ALJ's determination refers to the alleged onset of disability date as July 15, 2005.  (ECF No. 13-2, PageID.55).

He stopped working in 2005 following a car accident.  (*Id.*, PageID.76).
Prior to the accident he worked as a bar tender.  (*Id.*).  He suffered a traumatic
brain injury, spinal injuries, vision impairment, and PTSD as a result of the
accident.  (*Id.*).  He experienced a second car accident in June 2008.  (*Id.*,
PageID.77).  He was involved in a third car accident at the time he was helping an
elderly friend living in the Florida Keys.  (*Id.*, PageID.78).  He received a $60,000
settlement as a result of the first accident, and an approximately $20,000
settlement for the third accident.  (*Id.*, PageID.79).

McLeod experienced "neuro-fatigue" causing him to fall asleep during the
middle of a conversation.  (*Id.*).  He also experienced memory problems and was
no longer able to "make lists."  (*Id.*, PageID.80).  After his first accident he
worked as a sales associate at Lowe's for six months, ending the work stint after
Lowe's declined to extend his contract.  (*Id.*, PageID.81).  While working at
Lowe's he had a good attendance record but occasionally forgot that he was
supposed to be at work.  (*Id.*).  He was unable to memorize the inventory in each
of the four to five aisles assigned to him and was limited by back and shoulder
injuries.  (*Id.*).  He was also unable to memorize lists of work responsibilities
which included stocking and cleaning.  (*Id.*).

McLeod was divorced the year before the hearing.  (*Id*., PageID.82).  He had joint custody of his daughter, seven, and son, three.  (*Id*., PageID.82-83).  He cared for his children from 8:00 a.m. to 6:00 p.m. Monday through Friday and every other weekend.  (*Id*., PageID.83).  His bedroom was on the second floor of a two-story house.  (*Id*., PageID.83).  He moved into the two-story home shortly after the third accident.  (*Id*., PageID.84).  He was married subsequent to the third accident.  (*Id*.).

Since the third accident, McLeod drove "[a]s little as possible," limiting his trips to rehabilitation and medical appointments.  (*Id*.).  He was unable to follow shopping lists prepared by his former wife.  (*Id*., PageID.85).  He refrained from attending church services due to "overstimulation" and "neuro-fatigue."  (*Id*.).  Driving short distances exhausted him for an entire day.  (*Id*.).  He had a Facebook account but no longer engaged in hobbies.  (*Id*., PageID.86).  Prior to the third accident, he was able to travel by plane to Florida without assistance.  (*Id*., PageID.87).  He denied the use of illicit drugs.  (*Id*., PageID.88).

Since the third accident, McLeod experienced shoulder, neck, and back pain as well as headaches.  (*Id*., PageID.89).  He experienced the medication side effects of confusion, fatigue, sleepiness, and euphoria.  (*Id*.).  He was able to take care of his personal needs and make meals but was unable to shop.  (*Id*.,

PageID.90).  He was able to take out the garbage, perform occasional laundry chores, and do light housework.  (*Id*.).  He was able to use a riding mower.  (*Id*., PageID.91).  In addition to earning a high school diploma, he had taken college courses.  (*Id*., PageID.91).  During the relevant period, he was limited to walking no more than 200 feet or standing or sitting for more than 20 minutes.  (*Id*., PageID.92).  He was limited to lifting 10 pounds.  (*Id*., PageID.92-93).  He was able to perform only limited bending.  (*Id*., PageID.93).  He experienced intermittent numbness and tingling of the hands but did not have problems with fine manipulations.  (*Id*., PageID.94).  He believed that he was able to perform two-step tasks, limited to activity that did not require repetitive twisting.  (*Id*., PageID.95).

Since the first accident, McLeod lost mental focus "very quickly."  (*Id*.). He was unable to "filter out" extraneous noise in even a relatively quiet setting. (*Id*., PageID.97).  During the same period, he experienced incapacitating "cluster" headaches at least 20 times a month.  (*Id*., PageID.98).  His former wife forbade him from handling their finances after he accidently sent out a blank, signed check in an unsealed envelope.  (*Id*., PageID.99).

On January 30, 2020, the ALJ found McLeod not disabled.  (*Id*., PageID.55-64).  On October 1, 2020, the Appeals Council denied review of the

ALJ's determination.  (*Id*., PageID.47).  McLeod timely filed suit in this Court on

December 3, 2020.  (ECF No. 1).

### B.    Medical Evidence[2]

In July 2005, McLeod sought emergency treatment one day after a car

accident, reporting that since the accident, he was misplacing items and

experiencing problems organizing his thoughts.  (ECF No. 14-2, PageID.974).  A

physical examination and CT of the brain were both unremarkable.  (*Id*.,

PageID.974-975;ECF No. 13-8, PageID.556-557).  A follow up examination by

Dana A. Bowers, Psy.D. noted that neuropsychological testing showed scores in

the impaired range in the areas of sustained attention and psychomotor processing

speed.  (*Id*., PageID.563).  She found no data to support even a mild brain injury

but noted a history of ADD.  (*Id*.).  She found that McLeod could continue to

make independent personal decisions and was capable of returning to competitive

employment "from a cognitive perspective."  (*Id*., PageID.564).  McLeod

exhibited a normal gait. (*Id*., PageID.561).

In January 2006, Terry L. Braciszewski, Ph.D. conducted a

neuropsychology "re-evaluation," finding that McLeod was incapable of returning

to his former work due to problems with balance, motor control, and cognitive

---

[2] Medical evidence pertaining to McLeod's condition subsequent to the December 31, 2010 expiration of DIB is included for background purposes only.

functioning.  (ECF No. 14-2, PageID.1021).  He found that McLeod would benefit from "a vocational assessment to determine appropriate placement and retraining opportunities."  (*Id*.).  He found further that McLeod's driving and money management skills should be reevaluated due to impaired attention skills.  (*Id*.).  He found that McLeod had trouble remembering to take his medication.  (*Id*.).  He advised continued cognitive therapy.  (*Id*., PageID.1022).  Dr. Braciszewski found that while some skills had not worsened, McLeod's cognitive problems were exacerbated by stress, depression, and anger.  (*Id*., PageID.1019).  January 2006 records show that McLeod engaged in martial arts training.  (ECF No. 14-5, PageID.1401, 1406).

The same month, neurologist Sylvia Anagnos, M.D. noted that McLeod's headaches were limited to two severe headaches in a four-week period.  (ECF No.14-2, PageID.1030).  In April 2006, Dr. Anagnos noted that McLeod's headaches were improved with prescription medicine and eyeglasses.  (*Id*., PageID.1034).  She observed that McLeod was awake, oriented, and fluent and that "post-traumatic headaches" were improved.  (*Id*.).  A January 2006 MRI of the cervical spine was wholly unremarkable.  (*Id*., PageID.955).  In July 2007, McLeod reported soreness after cleaning his house but was able to go on a camping trip with children without "too much difficulty."  (ECF No. 13-7,

PageID.300).  A neurological examination of the extremities was unremarkable. (*Id*.).  McLeod's condition was deemed "stable." (*Id*.).

In June 2008, McLeod sought emergency treatment following a second car accident.  (ECF No. 13-7, PageID.310).  The following week, physical medicine and rehabilitation specialist Luke Y. Kim, M.D. noted a limited range of motion of the cervical and lumbosacral spine and muscle tightness.  (*Id*.).  In September 2008, Dr. Braciszewski performed a second neuropsychology reevaluation, recommending "cognitive behavioral" therapy for anxiety and depression, light cardiovascular and strength training, and vocational assistance.  (ECF No. 14-6, PageID.1514, 1525).  McLeod reported one headache each week but that he was not taking prescription medication.  (*Id*., PageID.1515).  Dr. Braciszewski noted that McLeod's neuropsychological condition had overall improved since the last evaluation.  ( *Id.*  PageID.1524).

In July 2009, McLeod sought emergency treatment following a third car accident.  He reported "mild" mid-back pain.  (ECF No. 13-7, PageID.338).  He appeared fully oriented.  (*Id*., PageID.339).  The following month and in September 2009, Dr. Braciszewski performed a neuropsychology reevaluation, noting McLeod's report of back pain and a subsequent diagnosis of whiplash.  (ECF No. 14-6, PageID.1551).  He noted that McLeod experienced "unpleasant flashbacks while driving."  (*Id*.).  Testing showed impaired functioning in "color-

8

word," testing; below average marks in grip strength and dominant hand fingering; and below average scores in processing speed index (coding) but otherwise average to superior functioning. (*Id*., PageID.1554-1556). Dr. Braciszewski recommended therapy to address depression, more engagement in social activities, and continuing acupuncture treatment for body pain. (*Id*., PageID.1561-1563).

In January 2010, speech language therapist Sean Eaton, M.A. of Ann Arbor Rehabilitation Centers stated that since the July 2005 car accident, McLeod experienced "cognitive difficulties with memory, attention and stamina" as a result of the "two" car accidents. (*Id.,* PageID.1564). He found that McLeod required accommodations to complete an academic program including additional time to complete examination and written assignments, the use of a computer and a "quiet environment." (*Id*., PageID.1564). Treating records by Eaton from the same month note McLeod's report of fatigue and anxiety in the academic setting. (*Id*., PageID.1566). A February 2010 MRI of the cervical spine shows mild cervical spondylosis without herniation and mild to moderate cervical facet hypertrophy. (*Id*., PageID.1599). McLeod reported that March 2010 steroid injections did not help the shoulder condition but reported good results from oxycodone. (*Id*., PageID.1631).

In June 2012, Gary Trock, M.D. performed a one-time review of the previous records, noting that none of the evidence showed a traumatic brain injury resulting from the accidents.  (ECF No. 14-6, PageID.1649-50).  He opined that McLeod did not experience cognitive impairments but "feigned impaired memory."  (*Id*., PageID.1649).  The same month, Christian Schutte, Ph.D. performed a neuropsychological evaluation and review of the records dating back to 2005, also noting no symptoms of traumatic brain injury related to the accidents but that the accidents "appear[] to have temporarily exacerbated" "preexisting psychiatric difficulties that were diagnosed in 1992."  (*Id*., PageID.1684).  McLeod reported that he was married with good family support.  (*Id*., PageID.1659).

A December 2012 MRI of the lumbar spine showed mild to moderate degenerative changes without severe central canal or neural foraminal stenosis.  (ECF No. 13-8, PageID.480-481).  In April 2013, McLeod sought right shoulder treatment after a three-year hiatus.  (ECF No. 13-8, PageID.438).  Treating records note 4/5 strength in right shoulder abduction and external rotation but otherwise full strength.  (*Id*., PageID.440).

On May 22, 2018, non-examining source Saadat Abbasi, M.D. found insufficient evidence of a significant work-related physical impairment prior to the December 31, 2010 expiration of DIB benefits.  (ECF No. 13-3, PageID.115).  He

cited August 2005 records showing a normal gait and an impaired attention span due to the preexisting condition of ADD.  He cited 2010 records showing neck pain, mild spondylosis of the cervical spine, and right shoulder tendinosis.  (*Id*., PageID.114).  He noted that McLeod exhibited tenderness of the thoracic and lumbar spine areas in July 2009 following a motor vehicle accident.  (*Id*.).  He cited 2007 records showing that in 2007, McLeod did volunteer work and reported that Zoloft "eliminated social anxiety" and improved his cognitive functioning. (*Id*.).

The same month, George Starrett, Ed.D. found insufficient evidence to show that the conditions of anxiety, Obsessive-Compulsive Disorder ("OCD"), or neurodevelopmental disorders caused significant work-related limitation.  (*Id*., PageID.116).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The

Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); 20 C.F.R. § 404.1520. "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this sequential analysis, the ALJ found that McLeod was not disabled under the Act.  At Step One, the ALJ found that McLeod had not engaged in substantial gainful activity from the alleged onset date of July 15, 2005 through the December 31, 2010 expiration of entitlement to DIB.  (ECF No. 13-2, PageID.57).  At Step Two, the ALJ found that McLeod had the severe impairments of "traumatic brain injury ("TBI"); attention deficit hyperactivity disorder ("ADHD"), combined type; mood disorder; generalized anxiety disorder; right side hearing loss; degenerative disc disease of the cervical and lumbar spines; migraine headaches; right shoulder impingement; left ulnar neuropathy; and post-traumatic disequilibrium."  (*Id.*, PageID.57-58).  At Step Three, the ALJ found that McLeod's impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment.  (*Id.*, PageID.58).

The ALJ then assessed McLeod's residual functional capacity ("RFC"), concluding that he was capable of performing exertionally light work with the following additional limitations:

> [Only] occasional ramps and stairs (with a handrail); no ladders, ropes, or scaffolds; occasional balance, stoop, kneel, crouch and crawl; frequent handling, fingering, and feeling bilaterally; frequent reaching in all directions except occasional overhead reaching with the right upper extremity; simple, routine, repetitive tasks (less than constant), not requiring a specific production rate, in a work environment free of fast pace production requirements, involving only simple work related decisions with few, if any, work place changes; no hazards (unprotected heights and operational control of dangerous moving

13

machinery) and ordinary hazards such as boxes and doors; a moderate
noise level (office setting to light industrial setting); no concentrated
exposure to vibration; no vibrating air or hand tools; and off task 8%.

(*Id.*, PageID.59).

At Step Four, the ALJ found that McLeod was unable to perform his past

relevant work.  (*Id.*, PageID.63).  The ALJ cited the VE's hearing testimony in

support of his Step Five finding that McLeod could perform the unskilled, light

work of a retail marker (310,000 positions in the national economy); dining room

attendant (45,000); and packer (160,000).  (*Id.*, PageID.64, 104).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although the court can

examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec.*

*of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited

one.  Judicial review is constrained to deciding whether the ALJ applied the

proper legal standards in making his or her decision, and whether the record

contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc.*

*Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499

F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve

conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of*

*Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017)(same).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term

means:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.   And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.   Substantial evidence, this Court has
> said, is more than a mere scintilla.   It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves

the judiciary's ability to review decisions by administrative agencies, but it does

not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of*

*Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence

standard . . . presupposes that there is a zone of choice within which the

decisionmakers can go either way, without interference by the courts.") (quoting

*Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's

factual findings are therefore subject to multi-tiered review, but those findings are

conclusive unless the record lacks sufficient evidence to support them.  *Biestek*,

139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

## V.    Analysis[3]

McLeod makes two arguments in support of a remand to the administrative level for further proceedings, contending first that the ALJ erred in assessing the subjective claims of limitation by improperly attacking his credibility. (ECF No. 21, PageID.1748-54). The Commissioner argues that the ALJ's reasons for

---

[3] Any issue not raised directly by the moving party is deemed waived. *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002).

rejecting McLeod's professed degree of limitation are well supported by the record and adequately articulated.  (ECF No. 24, PageID.1770-89).

Second, building on his first argument, McLeod contends that the hypothetical question to the VE, and by extension the RFC found in the administrative determination, does not reflect his true degree of limitation.  (ECF No. 21, PageID.1754-58).   The Commissioner argues in turn that the ALJ did not err in declining to include the unsupported claims of limitation in the modifiers posed to the VE or in the identical RFC.  (ECF No. 24, PageID.1789-91).

A.    Subjective Symptoms - SSR 16-3p

The Social Security Regulations establish a two-step process for evaluating a claimant's subjective symptoms, including pain.  20 C.F.R. § 404.1529(a); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  An ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p.  This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' ... to 'clarify that

17

subjective symptom evaluation is not an examination of an individual's character.'") (quoting SSR 16-3p at *1).

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the claimant's alleged limitations, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve pain; and (7) other factors concerning functional limitations.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

An ALJ's subjective symptom evaluation is given great weight and should not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  At the same time, "such determinations must find support in the record."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

McLeod argues that the ALJ did not give "meaningful consideration" to the seven factors set forth above in addressing the second prong of SSR 16-3p.  (ECF No. 21, PageID.1748).  Contrary to this argument, the ALJ discussed all the factors pertinent to McLeod's claims of disability.  As to daily activities, the ALJ noted that during the relevant period, McLeod was able to work at Lowe's, travel, engage in martial arts, perform volunteer activities, and drive.  (ECF No. 13-2,

PageID.61).  The ALJ also noted that McLeod was able to live independently.

(*Id.*, PageID.62).  *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir.

2007) (subjective claims of limitation permissibly undermined by the ability to

perform light household chores, travel, and engage in activity outside the home).

As to the alleged frequency and intensity of pain, the ALJ noted that

McLeod's allegations of multiple cluster headaches each month was unsupported

by the treating records.  (*Id*).  The records show that as of January 2006, McLeod

reported only two severe headaches a month.  (ECF No. 14-2, PageID.1030).

April 2006 records show that the headaches were improved with medication and a

new eyeglass prescription.  (*Id.*, PageID.1034).

As to "precipitating and aggravating factors," the ALJ acknowledged

McLeod's report of impaired balance following the accident and an EMG which

was positive for neuropathy.  (ECF No. 13-2, PageID.61).  The ALJ noted that

while McLeod's ability to engage in martial arts undermined his claims of balance

problems, he nonetheless limited McLeod to work with only occasional postural

requirements; a preclusion on the use of ladders, ropes, or scaffolds; and a

preclusion on working with hazards.  (*Id.*).

The ALJ also noted that "there is no mention of [medication] side effects in

the treatment notes."  (*Id.*, PageID.62).  *See Bentley v. Comm'r of Soc. Sec.*, 23 F.

App'x 434, 435, 2001 WL 1450803, at *1 (6th Cir. 2001) (ALJ did not err in

rejecting allegations of medication side effects where "nothing in the notes of

[the] treating physicians" showed that "medication caused drowsiness as a side

effect."). The ALJ observed that McLeod's treatment had been administered on

an exclusively outpatient basis and that the treatment for physical conditions was

limited to physical therapy and cervical injections. (ECF No. 13-2, PageID.62).

The ALJ noted that cognitive testing showed average intellectual functioning.

(*Id*.).

Contrary to McLeod's overlapping argument that "the brevity and lack of

specificity in the ALJ's analysis is problematic," the ALJ provided a detailed,

three-page rationale for discounting McLeod's professed level of limitation. (ECF

No. 21, PageID.1753) (ECF No. 13-2, PageID.59-62). The argument that the ALJ

provided a truncated, non-specific analysis of the subjective claims should

therefore be rejected.

McLeod also takes issue with the ALJ's citation to Drs. Trock and Schutte's

June 2012 observations that McLeod "may have embellished his deficits." (ECF

No. 21, PageID.1749) citing (ECF No. 13-2, PageID.60). He argues that the

ALJ's observation "is obviously referencing [his] credibility" contrary to SSR 16-

3p's explicit elimination of "the use of the word 'credibility' " in evaluating a

claimant's symptomology. (ECF No. 21, PageID.1749).

McLeod's argument fails for two reasons.  First, the ALJ did not err in noting that Dr. Schutte's and Dr. Trock's findings of no long-term impairment from the car accidents undermined Dr. Braciszewski's finding of some degree of reduced cognitive function.  (ECF No. 13-2, PageID.60).  The ALJ's failure to provide an explanation for according more persuasive value one medical source rather than another would have constituted error.  *See* 20 C.F.R. § 404.1520c(b) (in assessing the medical opinions, ALJs must articulate the "most important factors of supportability and consistency" of the medical opinions.).

Second, the observation that at least one examining source believed that McLeod was feigning symptoms of a closed head injury is not the same as the ALJ simply making an unsupported, generalized finding that McLeod's allegations lacked merit.  *See Hobbs v. Comm'r of Soc. Sec.*, No. 5:18-CV-446, 2019 WL 315046, at *15 (N.D. Ohio Jan. 23, 2019) (ALJ did not err in noting doctor's belief "that Hobbs exaggerated his pain symptoms," along with other citation to other portions of the record, supported the rejection of Hobbs' professed degree of limitation).  Likewise here, the ALJ's observation that at least one source believed McLeod was feigning symptoms of a traumatic brain injury (combined with other numerous citations to the record showing less than disabling symptomology) was permissibly used to reject the allegations of disabling impairment.

B.     The Hypothetical Question and RFC

McLeod also argues that the hypothetical modifiers posed to the VE and the identical RFC found in the administrative opinion do not reflect his full degree of limitation.  (ECF No. 21, PageID.1756).

It is well settled that vocational testimony given in response to a question that does not include all of a claimant's relevant limitations does not constitute substantial evidence.  *Varley v. Comm'r of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  However, the ALJ is not required to incorporate unsubstantiated claims in hypothetical question to VE or by extension, the ultimate RFC.  *Stanley v. Sec'y of Health and Human Servs.*, 39 F.3d 115, 118–119 (6th Cir. 1994).

McLeod argues in effect that the ALJ erred by failing to credit speech therapist Eaton's January 2010 finding of "cognitive difficulties with memory, attention and stamina" and need for accommodations in an academic setting, and Dr. Braciszewski's findings of psychological and physical limitation in crafting the RFC.  (ECF No. 21, PageID.1758) citing (ECF No. 14-6, PageID.1514-1524,1551-1563, 1564).

As a threshold matter, the RFC reflects Eaton's and Dr. Braciszewski's findings of memory, focus, and persistence by limiting McLeod as follows:

> [S]imple, routine, repetitive tasks (less than constant), not requiring a specific production rate, in a work environment free of fast pace

production requirements, involving only simple work related decisions with few, if any, work place changes; no hazards (unprotected heights and operational control of dangerous moving machinery) and ordinary hazards such as boxes and doors; [and] a moderate noise level

(ECF No. 13-2, PageID.59).   Further, while Eaton found that McLeod would require accommodations in an *academic* setting that would necessarily involve the constant processing of new information, the RFC crafted by the ALJ limited McLeod to unskilled work involving only simple decisions, few workplace changes, and no production requirements.  (*Id.*).  Similarly, McLeod fails to show how the RFC falls short of the functional limitations identified by Dr. Braciszewski who found (despite the allegations of depression and anxiety) almost exclusively average to above average scores (with the exception of processing speeds and "color-word" testing) and reports of "unpleasant flashbacks while driving."  (ECF No. 14-6, PageID.1551, 1554-1555).

In addition, McLeod argues briefly that the while the ALJ found the mood disorder and anxiety were severe impairments at Step Two of his analysis, the RFC does not reflect those conditions.  (ECF No. 21, PageID.1757).  To be sure, McLeod is correct that in crafting the RFC, the ALJ must consider both the severe and non-severe limitations.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (ALJ required to consider all of the Step Two findings in determining RFC).  However, the ALJ acknowledged that McLeod

experienced significant limitation in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace and modified the RFC accordingly to restrict him to "simple, routine, repetitive tasks . . . not requiring a specific production rate" and "few, if any, work place changes." (ECF No. 13-2, PageID.58-59). These restrictions encompass his mood disorder and anxiety impairments. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (standing alone, "limitation to simple, routine, and repetitive tasks adequately conveys [claimant's] moderately-limited ability to maintain attention and concentration for extended periods.") (internal citations omitted). While McLeod relies on Dr. Braciszewski's opinions in support of remand, a liberal reading of those opinions fails to support a finding of greater than moderate cognitive or psychological limitation.

In sum, while McLeod suffers from some impairments, the ALJ's determination that he is capable of work within the confines of the RFC is supported by substantial evidence. The ALJ's decision that McLeod is not disabled under the Act was within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Blakley, supra,* 581 F.3d at 406.

## VI.   Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's motion (ECF No. 24) be GRANTED, that McLeod's motion

(ECF No. 21) be DENIED, and that the Commissioner's decision be AFFIRMED.


Dated: February 9, 2022                          s/Kimberly G. Altman
Detroit, Michigan                                KIMBERLY G. ALTMAN
                                                 United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise

some issues but fail to raise others with specificity will not preserve all the

objections a party might have to this Report and Recommendation.  *Willis v. Sec'y*

*of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local

Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 9, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager
